2026 IL App (2d) 250055
No. 2-25-0055
Opinion filed July 9, 2026

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

MIRAMAR CAPITAL, LLC, and ROBERT KALMAN, Plaintiffs-Appellees and Cross-Appellants,

v.

WELLS FARGO CLEARING SERVICES, LLC d/b/a Wells Fargo Advisors, and STEVEN HEFTER, Defendants

(Steven Hefter, Defendant-Appellant and Cross-Appellee).

Appeal from the Circuit Court of Lake County.
Honorable Charles William Smith, Judge, Presiding.
No. 19-L-801

JUSTICE MULLEN delivered the judgment of the court, with opinion.
Justices Schostok and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiffs Miramar Capital, LLC (Miramar) and Robert Kalman filed a verified complaint against defendants Wells Fargo Clearing Services, LLC d/b/a Wells Fargo Advisors (Wells Fargo) and Steven Hefter.[1] As amended, the complaint alleged that Hefter, an investment advisor working as an agent for Wells Fargo, made false statements to plaintiffs' clients that wrongly alleged past fraud by Kalman (an investment advisor for Miramar) in connection with Kalman's profession in

_____

[1]Miramar was initially a plaintiff in this action. During trial, however, the trial court granted defendants' oral motion for a directed verdict against Miramar.

an attempt to lure those clients from plaintiffs. Plaintiffs sought recovery under theories of defamation *per se* (count I), false light invasion of privacy (count II), and a violation of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2018)) (count III).

¶ 2 The matter proceeded to a jury trial in the circuit court of Lake County on counts I and II.[2] The jury found Hefter liable to Kalman for defamation *per se*. The jury awarded Kalman compensatory damages from Hefter in the amount of 50% of all legal fees, $100,000 in presumed damages, and $2.5 million in punitive damages. The jury also found Hefter liable to Kalman for false light invasion of privacy and awarded compensatory damages in the amount of $100,000 on that count. Finally, the jury found Wells Fargo liable to Kalman for compensatory damages in the amount of 50% of all legal fees and $25 million in punitive damages. In response to defendants' posttrial motions, the trial court struck the jury's awards of attorney fees against defendants. The court also struck the award of compensatory damages for false light invasion of privacy on the basis that it constituted a double recovery. Finally, the trial court found that the punitive damages awards were excessive and remitted them to $1.1 million against each defendant, for a total of $2.2 million. After denying Kalman's motion to reconsider, the trial court entered an order and amended judgment. Hefter filed a notice of appeal, and Kalman filed a notice of cross-appeal.[3]

¶ 3 On appeal, Hefter raises two principal issues. He first argues that a new trial is necessary to cure various prejudicial errors committed by the trial court with respect to the court's evidentiary rulings. Alternatively, Hefter asserts that the punitive damages award as reduced is excessive and requires further remittitur. In his cross-appeal, Kalman contends that the trial court erred in

---

[2]Prior to trial, the trial court granted defendants' motion to dismiss count III.

[3]Wells Fargo has not appealed.

remitting the punitive damages award and asks that we restore the full award of punitive damages. We affirm.

¶ 4                     I. STATEMENT OF FACTS

¶ 5                       A. The Parties

¶ 6      Hefter is an investment advisor with more than 30 years of experience in the financial industry. When the conduct relevant to this litigation occurred, Hefter was employed by Wells Fargo. Kalman is an investment advisor and portfolio manager. Kalman has worked in the investment industry for approximately 30 years. Miramar is an advisory firm registered with the Securities and Exchange Commission (SEC) that manages the discretionary assets of individuals, small foundations, and institutions. Kalman and Max Wasserman formed Miramar in 2018.

¶ 7                   B. The Voicemail and Aftermath

¶ 8      This matter involves a voicemail Hefter left on December 6, 2018, for Victoria "Rivka" Zell. Zell, someone known socially to both Hefter and Kalman, received money in a divorce settlement. Hefter learned that Zell was planning to use Kalman to manage her money. Hefter had never heard of Kalman, so he researched Kalman on BrokerCheck and Google.[4] Hefter also conducted a Google search of Richard Kushnir (Richard), Kalman's former partner.

¶ 9      After reviewing publicly available information about Kalman, his firms, and his business associates, Hefter was "concerned." On December 6, 2018, Hefter called Zell because he was

---

[4]BrokerCheck is a tool on the website of the Financial Industry Regulatory Authority (FINRA) that allows the public to search for information about financial advisors, including employment history, customer disputes, and regulatory actions. See About BrokerCheck, Fin. Indus. Regul. Auth., https://www.finra.org/investors/investing/working-with-investment-professional/about-brokercheck (last visited June 10, 2026) [https://perma.cc/PLB5-KKTZ].

"worried about [her]" and "wanted to make sure she understood everything." When Zell did not answer, Hefter left the following voicemail:

> "Rivka, it is Steve Hefter. Um, it was good seeing you yesterday, albeit it was at a funeral. Um, I hope you give me a call. I'm concerned that you're a very active person in the community and you contribute to a lot of really good causes. There is some concern with the guy you seem to be going with, having defrauded, uh, investors in the past and having that on his record, and I just want to chat with you and make sure you have dotted your i's and crossed your t's. Um, because I know there is a guy, that we know, that lost tens of millions of dollars with a small firm, uh, because they had a problem, and they went bust and it wasn't any money [*sic*] to repay the investors. I don't know that that's the situation because I don't know much more than what the, uh, filings are reporting about what was done in the past, but I'm concerned enough that I'd appreciate it if you would just give me a call. Thanks. [Hefter's phone number]. Bye."

Also on December 6, 2018, Hefter sent Zell the following e-mail:

> "Rivka,
>
> You may want to ask your broker why 3 of his previous firms were expelled from the regulatory agency, FINRA [the Financial Industry Regulatory Authority]. Over 35 years I've seen investors lose lots and lots of money when the small firms they were with went under.
>
> Another question to ask the advisor is do they have experts associated with the various investment vehicles and are they able to construct portfolios optimizing the choice between individual stocks, ETF's, mutual funds, separately managed outside managers, private equity, real estate and funds that are hedged.

- 4 -

Please give me a call at your convenience."

Hefter attached to the e-mail a "Broker Registration History" screenshot from BrokerCheck showing the expulsion of the firms referenced in the e-mail. Plaintiffs learned of the contents of the voicemail and later received a copy of the voicemail from Zell on December 20, 2018.

¶ 10   On December 31, 2018, Zell complained to Hefter via e-mail about his voicemail and follow-up e-mail. In her December 31, 2018, e-mail, Zell stated that she found Hefter's "comments, phone message and email stating the person managing [her] money has defrauded investors to be despicable." Zell continued:

> "You have accused my 'broker' of being involved in fraud in a voicemail, and then you forwarded me this screenshot from FINRA. When I went to [the FINRA website] to see how many disclosures he has, it's ZERO. You misrepresent the facts on purpose for your gain, not my protection. I think that your salesmanship is unethical and, quite frankly, deserves some kind of formal action."

¶ 11   Hefter reported Zell's complaint the next day (January 1, 2019) to Wells Fargo via an e-mail to Heide Murray, attaching Zell's e-mail of December 31, 2018. In the e-mail to Murray, Hefter stated:

> "Rivka Zell is someone Eli Wald [a financial advisor at Wells Fargo] and I have known socially for years. Eli had scheduled 2 meetings with her to discuss our services, both of which she cancelled. I saw her a month ago at an event and she said she would call me to schedule a meeting. She never did.
>
> Eli sent me the Finra report that's available on the image 003 link. When you click on the 9 firms [Kalman] owned or worked for you will see that Finra expelled 3 of them.

In my note to Rivka I suggested that she might want to ask why those 3 firms were expelled by the regulators."

Further, Hefter wrote, "You can see by [Zell's] response that she thinks I said her broker defrauded investors. This is false. I did not say that[.]" The complaint transmittal form initiated by Wells Fargo also disclaimed the use of the phrase "defrauded investors." As part of its investigation into the matter, Wells Fargo reviewed the public record and had meetings with Hefter, Zell, and Kalman's counsel. Ultimately, Wells Fargo declined to discipline Hefter, concluding that he had not violated any industry standards.

¶ 12                    C. The Complaint and Pretrial Proceedings

¶ 13    Kalman filed his original verified complaint against Hefter and Wells Fargo on November 1, 2019. In their answer to Kalman's verified second-amended complaint, Wells Fargo and Hefter raised various affirmative defenses, including innocent construction, qualified and conditional statements, substantial truth, and first amendment. Following motion practice regarding the pleadings and a prior appeal involving whether the issues raised were subject to FINRA's mandatory arbitration provisions (see *Miramar Capital, LLC v. Wells Fargo Clearing Services, LLC*, 2021 IL App (2d) 200602-U), the parties commenced discovery on Kalman's verified second-amended complaint.

¶ 14    Throughout the discovery process, in responses to written requests and at his deposition, Kalman indicated that he had no documents supporting or related to his request for damages. On the eve of trial, Kalman sought leave to amend his disclosures to include invoices for attorney fees he claimed to have incurred in connection with the litigation. The trial court ruled that due to the lack of disclosure during discovery, Kalman would not be permitted to introduce the invoices at trial or testify to the amount of fees. Kalman would, however, be permitted to testify that he had

incurred attorney fees. Also prior to trial, the court ruled on various motions *in limine*. As a result of these rulings, the trial court excluded any evidence regarding the conduct of third parties, including certain aspects of the relationship between Kalman and his former partner, Richard. In addition, the court excluded evidence of two lawsuits: Braverman v. Kalman Kushnir Capital, LLC, No. 2017-L-000847 (Cir. Ct. Cook County), and DirecTV, Inc. v. Kalman, No. 03-CV-08610 (U.S. Dist. Ct., N.D. Ill.).

¶ 15 Following a motion seeking reconsideration or clarification regarding the motions *in limine*, the trial court ruled that Hefter would be permitted to introduce evidence that he associated Kalman with Richard "based on the public record and their prior associations"; that Hefter had knowledge that Richard had regulatory, litigation, and disciplinary issues; and that Hefter was referring not only to Kalman when he said "the guy" but also Kalman's firms, partnerships, and prior associations. The trial court also provided specific guidance about what testimony Hefter could offer, stating that Hefter could testify that Richard was Kalman's partner; that Richard "had regulatory problems, and that is why [Hefter] was concerned"; that Kalman "had been associated with [Richard] for a number of years *** [and Richard] had been barred from securities"; that Richard "had been disciplined and had lost his right to sell securities and that [Richard] was a partner to Kalman for a number of years"; that Hefter viewed the Kalman-Richard firms "all the same"; and that "Kalman's former partner had regulatory complaints against him that caused *** Richard to lose his license, and that they had nothing to do with Kalman." But some evidence remained excluded, and Hefter made offers of proof at trial regarding certain excluded evidence, each of which resulted in the trial court standing on its prior ruling.

¶ 16                                    D. The Trial

¶ 17    Prior to witness testimony, the trial court read to the jurors Hefter's December 6, 2018, voicemail to Zell. The following witness testimony was then presented.

¶ 18                                1. Plaintiff Robert Kalman

¶ 19    Kalman testified that Miramar caters to high-net-worth individuals and entities and requires a minimum client investment of $1 million. All of Miramar's business comes via referrals from existing clients. In 2022, Miramar reported revenue of $3.322 million, and Kalman reported personal income of $583,599. Zell became a Miramar client in 2018 after she enlisted Kalman's advice during her divorce. Kalman and Miramar are competitors of Hefter and Wells Fargo.

¶ 20    Kalman further testified that at the time he learned of the voicemail, he was Zell's financial advisor. Kalman testified that he was "horrified" and "angry" after hearing the voicemail. Kalman was upset that anyone would say anything like that about him. Kalman stated that the voicemail put a "substantial" strain on his relationship with Zell, requiring him to defend himself and "somehow prove a negative since nothing like that had ever happened." To reassure Zell that he had never defrauded investors in the past, Kalman and Zell reviewed public documents that "showed [he] had never had any disclosures in terms of bad acts in [his] 30-some years in the business." Kalman noted that as time went on, Zell "saw the relationship for what it had always been, and she remain[ed] with [Miramar] and does to this day." Kalman was asked whether he took steps to investigate if Hefter made the same statement to others. Kalman responded:

> "Well *** it's the type of thing once you hear something like that, you can't unhear it, so
> to go out in the community where we build our business and to ask questions of that nature,
> we just couldn't do that because it would all of a sudden introduce something again that

- 8 -

was not true. So other than—well, I actually shared it with [Wasserman], obviously, because he was my partner."

¶ 21    Kalman testified that he has never defrauded an investor or client. Further, he has never been accused of defrauding an investor. Kalman testified that he has never been disciplined by any governing body or regulatory authority in the financial industry and he has never been sanctioned or disciplined by any employer for defrauding an investor. In addition, Kalman testified that he has never been indicted by any state or federal law enforcement agency for committing fraud on an investor.

¶ 22    Kalman acknowledged that, following the voicemail, he did not lose Zell as a client. Kalman further acknowledged that since Zell became a client, Miramar has grown its business. Asked what damages he suffered because of the voicemail Hefter left for Zell, Kalman responded:

"Well, anyone with a conscience who has something like that said about them where you know it's not true, it just affects you, and I don't know any other way to describe it, but if someone says something about you that is patently false and they did it for no other reason than to gain more business, it made me—it made me crazy."

Kalman elaborated that he was depressed for a period of time and had many sleepless nights. In addition, Kalman testified that he and Wasserman spent "an inordinate amount of time" trying to figure out what to do to make sure Zell did not believe the untrue allegations in the voicemail. Kalman also testified that the voicemail worried him because Miramar was a brand new company and the voicemail

"literally could have ended [his] career instantly because anyone who has a financial advisor knows that the number one issue is do you trust that person because if you do, then

you trust what they're telling you is correct and that they have your best interests at heart, and us being fiduciaries means that by law we must."

¶ 23    Kalman testified that he filed the lawsuit because it was the only way to clear his name. Kalman testified that prior to hiring the law firm representing him in the case, he and his attorneys discussed legal fees. Kalman agreed to pay the law firm all legal fees, costs, and expenses incurred in litigating the case. Over Hefter's objection, Kalman testified that he reviewed the law firm's billing statements and that the firm spent approximately 730 hours over more than four years working on the case.

¶ 24    On cross-examination, Kalman testified about his employment history, using the BrokerCheck screenshot Hefter attached to his December 6, 2018, e-mail to refresh his recollection. Kalman noted that he was registered as a broker with R.D. Kushnir & Co. from 1990 to 1998, Liss Financial Services from 1998 to 2001, Shamrock Partners, Ltd., from 2001 to 2002, Phillip Louis Trading, Inc., from 2002 to 2003, Jersey Shore Trading Group, Inc., from 2003 to 2005, Foresight Investments from 2005 to 2016, and Saxony Securities from 2016 to 2018. In addition, in 1994, Kalman founded Kalman-Kushnir Capital (KKC) with Sara Kushnir, Richard's wife.

¶ 25    Kalman further testified on cross-examination that he is not aware of Hefter contacting any clients except for Zell. Kalman also acknowledged that he has no "actual damages." However, he stated that he was "distraught for a while" that someone would create lies about him and his history for the sole purpose of poaching a client. He also suffered from "personal angst" and lost many nights of sleep over the matter. Kalman acknowledged that Zell did not pull any business from Miramar but explained that Zell became "tentative for a period of time" and only "got past it" after she became satisfied that none of the allegations had any basis. Kalman admitted that a couple of

- 10 -

weeks after Hefter sent the voicemail to Zell, he (Kalman) and Zell exchanged friendly texts in which he asked Zell about her personal life, set up a lunch meeting, and invited her to Hawaii.

¶ 26                                    2. Defendant Steven Hefter

¶ 27    Kalman called Hefter as an adverse witness. Hefter testified that Wells Fargo charged clients a percentage fee based on the value of assets under investment management. Thus, the more money Wells Fargo had under investment management, the more money Wells Fargo earned. Hefter estimated that at the time he left the voicemail for Zell, Wells Fargo had approximately $2 billion under investment management.[5] Hefter further testified that for the 2022 calendar year, he reported $5,680,508 in taxable income on his tax return. Hefter estimated his net worth at $25 million.

¶ 28    Hefter testified that early in 2018, an associate working at Wells Fargo was attempting to solicit Zell as a client. By November or December 2018, however, it became clear that Zell was not interested in hiring Wells Fargo to manage her assets. At that point, Wells Fargo was "going to try to explain to her what was available to her, but [they] were no longer counting on bringing her in as a client."

¶ 29    Kalman's attorney asked Hefter about the identity of "the guy" he refers to in the voicemail. Hefter initially responded that "the guy" is "Robert Kalman and his association with Richard Kushnir." When Kalman's attorney noted that Hefter referred only to a singular "guy," Hefter stated that "the guy" he is referring to in the voicemail is Kalman. Hefter explained:

> "In that statement, that whole voice recording that you heard, I was saying that I
>
> had personal knowledge of someone who had money with two firm—two-person firm

_____

    [5]The parties also stipulated that Wells Fargo had a "reported equity of 13.9 billion [dollars] at the end of 2023."

- 11 -

whose one person committed fraud and the other person did not, but the firm lost all the money to the client that we had known because one person goes down, the other person goes down with them [*sic*].

And my concern with Rivka was that if he [Kalman] had association with this guy who had been barred from FINRA that she could indeed be in trouble.

If they did have another situation like that, even if Robert Kalman wasn't the one who did it, if his partner for 30 years did something wrong, then she could be in trouble."

Referring to Kalman, Hefter added that he "tried to encompass everything that [he] was reading [because] it was the worst thing that [he] had ever seen for a broker."

¶ 30    Hefter also stated that Kalman had "loads, loads of issues." Kalman's attorney then asked Hefter "What issues did Mr. Kalman have?" Hefter responded, "Well, he was being sued by a public company." Kalman's attorney objected. A sidebar was held outside the presence of the jury. During the sidebar, which included Hefter, the trial court first indicated that Kalman's attorney had "opened the door" with the question. As the sidebar continued, the trial court stated:

"The guy you seem to be going with having defrauded investors in the past. That's what you said—sir, sir, this case is not about your concerns or your interpretations. We are going to follow the rules of law here. That's why we spent the hours we spent last week going over a Motion in Limine, not for you to turn it around and start telling the jury what your concerns are. The concerns are irrelevant. It's what you said. That's why I asked you, specifically, sir, do you have any evidence or any knowledge that Mr. Kalman ever defrauded an investor?"

Hefter responded in the negative. The trial court then instructed that when questioning resumed before the jury, Kalman's counsel was to ask the final question that the court had posed during the

sidebar and Hefter was to give the answer he had provided in response. When the jury returned, the trial court struck the question and answer asked just prior to the sidebar. Examination continued pursuant to the judge's instructions, with Hefter acknowledging that he had no evidence that Kalman ever defrauded an investor. Moreover, he admitted that he has never apologized to Kalman or issued a written retraction of the statement in the voicemail.

¶ 31 During examination by his own attorney, Hefter testified that when he looked on the FINRA website, "there were notations under Mr. Kalman's brokerage—broker check that indicated some issues." Hefter's attorney then asked Hefter, "[W]hat did you find? What were your concerns?" With no objection pending, the judge ordered counsel to the bench. The following exchange occurred during the sidebar that ensued:

"THE COURT: Did I not issue a Motion in Limine to say that we are not going to go into *** Mr. [Richard] Kushnir's records?

MR. ERICKSON [Hefter's attorney]: He's been prepped multiple times. He's going to work within the parameters of what you said.

MR. UDELL [Kalman's attorney]: He is not though, Judge. There is nothing on Robert Kalman's FINRA records. This is all Kushnir, again.

THE COURT: Wait a minute. What is it you're trying to elicit by this question?

MR. ERICKSON: The things that are admissible and that would follow the rule. The expelled firms and the long time relationship with the Kushnirs and Mr. Kushnir's problematic history, all in general terms.

THE COURT: You're not focusing that this has to do with Kushnir [*sic*]. Do you have anything concerning Kalman?

- 13 -

MR. ERICKSON: There will be some—[I] anticipate there will be some testimony about that.

THE COURT: What?

MR. ERICKSON: I can speak up. There will be a discussion, I expect[,] of a lot of smaller firms moving around a lot.

THE COURT: No, there won't.

MR. ERICKSON: Those are his concerns. Those are part of his concerns.

MR. UDELL: If I can add, Judge, he was just asking about the check you did on Kalman. And now he is going to go off and say that that produced results of firms that has nothing to do with this. It's the same thing.

THE COURT: I've said it before, I'll say it one more time, you can ask anything that has to do with Kalman, okay.

MR. ERICKSON: But—

THE COURT: That's it.

MR. ERICKSON: But I can ask—

THE COURT: You can ask him if in his checks, he had concerns about Mr. Kushnir. But you are trying to paint a picture that Kalman is Kushnir and that's what I have said throughout last week and throughout this trial. Now, I expect you to abide by that, Counsel.

MR. ERICKSON: Okay. *** What were his concerns?

THE COURT: What?

MR. ERICKSON: What were his concerns with Mr. Kalman.

THE COURT: Well, his concerns have to be based on something objective.

MR. UDELL: Kalman.

- 14 -

THE COURT: Kalman. He's already answered that Kalman has nothing on his record.

MR. ERICKSON: Correct.

THE COURT: So what are you trying to do here? You are trying to put Kushnir on his record.

MR. ERICKSON: I'm trying to give him an opportunity to explain the concerns that he saw in the public record.

MR. UDELL: It has nothing to do with Kalman.

THE COURT: The concerns don't have to do with Kalman, how are they relevant?

MR. ERICKSON: They were his concerns. They were the reason that he made— left the voice mail and they dovetail to what he said exactly.

THE COURT: No, they don't. I'm trying very hard to give you leeway. I know you don't totally disagree with my ruling [*sic*], but it is my ruling.

MR. ERICKSON: I understand.

THE COURT: So you're to restrict your questions to things that Kalman did. If he has concerns about Kushnir, he can say that in his investigation of Kalman, he felt things about his former partner, Kushnir, that caused him concerns. That's it.

MR. ERICKSON: Okay.

THE COURT: All right. Move on.

MR. ERICKSON: Can I ask him if he heard of all of that, because I want to make sure—

THE COURT: No. You phrase the questions that is outside the scope of what he is, there will be an objection and I will rule.

MR. ERICKSON: Thank you."

¶ 32    After the sidebar, testimony resumed as follows:

"Q. [by Hefter's attorney] When you looked at Mr. Kalman, what were your concerns?

A. Okay. I'm going to say this so I don't get into anything that's controversial, but I was concerned that three firms he had been with—

MR. UDELL: Objection, your Honor.

BY THE WITNESS:

A.—had been expelled.

THE COURT: Hold on.

BY THE WITNESS:

A. His firm, they were firms that he worked for.

THE COURT: Excuse me, sir. When I say there is an objection, you stop talking. The record will reflect that the witness just shrugged his shoulders like the Court doesn't know what he's talking about. I am not going to tolerate that, sir. Thank you. Objection sustained. Move on."

Hefter's attorney then asked him what his concerns were when he looked at Kalman's records. Hefter responded that he "saw things *** that would worry [him] referring [Kalman] to anybody to manage money for them." Asked the nature of what he saw, Hefter responded, "I don't know if I can say that he had been accused of gross malfeasance." Kalman's attorney's objection to Hefter's response was sustained.

¶ 33    Hefter further testified that he had concerns about Kalman's partnerships. He explained that when there are only two or three partners in a firm, "if one of them makes a mistake and loses

a lot of money for a client, and that client tries to recover the money, I've seen situations where they are unable to recover because it's a small firm *** regardless of which broker did the harm." Hefter stated that he was alarmed by Richard's record because Richard was barred by FINRA and Richard "was associated with Mr. Kalman for the next 25 years and they remained partners." During Hefter's testimony, Zell's December 31, 2018, e-mail was admitted into evidence, portions of which Hefter read to the jury. Also admitted into evidence was the January 1, 2019, e-mail from Hefter to Murray.

¶ 34    Hefter's attorney asked him why in the voicemail he used the phrase "there is some concern *** with the guy you seem to be going with having defrauded investors in the past"? Hefter responded:

> "You know, in retrospect, obviously, I wish I could have that back. I was leaving a voice mail. I was trying to incorporate a lot of things that I was seeing all at once. And things that I was seeing, instead of using the words that I was actually seeing on the screen, I used that word, which is probably not the best word, because I didn't expect it to be taken literally. I expected this was just a phone call to plead with [Zell]. She called me back [*sic*] and then I would read to her what I saw and she can judge for herself. So it was an off the cuff not well thought out phrase. And the rest of the e-mail, though, was much more about what I was concerned about, which was the smallness of the firms and the other things that I had seen online."

¶ 35    Hefter testified that he did not communicate anything to Zell that was not in the public record. Hefter denied that he ever stated "with certainty that anyone had defrauded investors in the past." He stated that the voicemail contained "qualifications and expressions of uncertainty." He explained, "I was uncertain and so I said that I don't know that that's the situation" and that he did

- 17 -

not "know much more than what the filings are reporting about what was done in the past." Hefter reiterated that, in retrospect, he should have used a word other than "defraud." Hefter also wanted to make sure that Zell "dotted [her] Is and crossed [her] Ts," meaning that he wanted to make sure she had done her due diligence. Hefter testified that he never told Zell that any of the Kalman partnerships "had ever been convicted after defrauding investors." Hefter acknowledged that in correspondence to Wells Fargo he denied saying that Zell's broker had defrauded investors, explaining that at the time he made the statements to Wells Fargo, he did not remember saying that anyone or any firm had done so.

¶ 36                            3. Plaintiff's Partner Max Wasserman

¶ 37    Wasserman, Kalman's partner in Miramar, testified that he was "stunned" when he heard the voicemail Hefter left for Zell. He then became "very concerned and then actually scared." Wasserman understood that "the guy" Hefter referred to in the voicemail was Kalman. He explained that because Miramar acquires clients through word of mouth, being accused of fraud "is a problem" and "could basically shut [the] firm down."

¶ 38    Wasserman further testified that after he heard the voicemail, his relationship with Kalman became "very tenuous for a little period of time." Wasserman quizzed Kalman thoroughly and questioned whether he missed something in his due diligence prior to forming Miramar with Kalman. Wasserman also researched various websites. Wasserman testified that BrokerCheck indicated that Kalman's record was "clean" with "no defraudment, no nothing." Similarly, the SEC website reflected that Kalman had "[z]ero complaints against him and no fraud." A Google search indicated that Kalman was "a very well, respectful advisor." Ultimately, Wasserman concluded that the allegations in the voicemail were "inaccurate." Wasserman testified that based on what he

- 18 -

knows as Kalman's partner and through his investigation, neither Kalman nor Miramar has ever defrauded an investor.

¶ 39 Wasserman testified that even after he was assured that the allegations were untrue, there was still tension between him and Kalman for several months. Kalman felt guilty that the voicemail may have affected his relationship with Wasserman and the firm. Wasserman was "very upset" and wondered if Hefter made similar statements to others. Wasserman noted that the financial services industry is built on trust, and there is no guarantee that a client will remain with a particular firm. Wasserman and Kalman focused on "trying to contain any damages [the voicemail] may [have] cause[d] and trying to ascertain *** if anybody spread any rumors about [them]." Wasserman believed that Miramar was damaged because of the voicemail but could not say if the firm lost business.

¶ 40 On cross-examination, Wasserman acknowledged that his investigation did not reveal a single person other than Zell who heard Hefter's voicemail. Wasserman also acknowledged that Miramar has since experienced "exponential growth" and that Zell remains a Miramar client.

¶ 41         4. Wells Fargo's Corporate Representative Jennifer Johnson

¶ 42 Jennifer Johnson, the designated corporate representative of Wells Fargo, testified that late in 2018 or early in 2019, Wells Fargo received a complaint from Zell about a voicemail and an e-mail she received from Hefter. Zell's complaint triggered an investigation by Wells Fargo. Johnson acknowledged that Wells Fargo was not aware of any finding or allegations that Kalman defrauded investors in the past. As part of the investigation, a representative of Wells Fargo interviewed Hefter and Zell and communicated with Kalman's attorney. Johnson testified that the investigation was closed in April 2019. Wells Fargo did not discipline Hefter at the conclusion of the investigation because it did not find anything that constituted an industry violation and it felt that

the information Hefter discussed was "substantially true" in that he premised his remarks with "many conditional statements." Wells Fargo never issued an apology to Kalman or a retraction of the statement in the voicemail.

¶ 43                                  E. Jury Verdict

¶ 44    Following Johnson's testimony, the parties rested and presented closing arguments. The jury returned the following verdict. As to count I, the jury found Hefter liable to Kalman for defamation *per se*. The jury awarded Kalman compensatory damages from Hefter in the amount of 50% of all legal fees, presumed damages of $100,000, and punitive damages of $2.5 million. As to count II, the jury found Hefter liable to Kalman for false light invasion of privacy and awarded compensatory damages from Hefter to Kalman in the amount of $100,000. Finally, the jury found Wells Fargo liable for compensatory damages in the amount of 50% of all legal fees and punitive damages of $25 million. The trial court entered judgment on May 23, 2024.

¶ 45                                  F. Posttrial Proceedings

¶ 46    All parties filed posttrial motions arguing flaws in the verdict. Hefter argued for a judgment notwithstanding the verdict (JNOV) as to both counts or, alternatively, a remittitur of the jury's punitive damages award. In addition, Hefter argued that he was entitled to a new trial due to prejudicial errors made by the trial court. Wells Fargo also moved for JNOV or, in the alternative, a remittitur of the damages or a new trial. Kalman argued that the judgment order entered by the court should be amended to include the amount of attorney fees (rather than the statement of 50% of all legal fees). The trial court granted Hefter's and Wells Fargo's motions in part, providing a JNOV as to count II in Hefter's favor, eliminating the award of attorney fees as compensatory damages, and remitting the punitive damages against Hefter from $2.5 million to $1.1 million and against Wells Fargo from $25 million to $1.1 million. Following a motion to reconsider by Kalman,

which was denied, an amended judgment was entered. Pursuant to the amended judgment, (1) Hefter was found liable to Kalman for defamation *per se* in the amount of $100,000 in presumed damages and $1.1 million in punitive damages, (2) the judgment entered against Hefter as to false light invasion of privacy was vacated, and (3) Wells Fargo was found liable to Kalman in the amount of $1.1 million in punitive damages. This appeal by Hefter and cross-appeal by Kalman ensued.

¶ 47                                                II. ANALYSIS

¶ 48     On appeal, Hefter raises two principal issues. He first argues that a new trial is necessary to cure various prejudicial errors committed by the trial court with respect to its evidentiary rulings. Alternatively, Hefter asserts that the punitive damages award, as reduced, is excessive and requires further remittitur. In his cross-appeal, Kalman contends that the trial court erred in remitting the punitive damages award and asks that we restore the full award of punitive damages. Before addressing the merits of this appeal, we are compelled to address the failure of Hefter's counsel to comply with the Illinois Supreme Court rules governing the form and content of appellate briefs.

¶ 49     Hefter's opening brief violates Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020). That rule provides that the appellant's statement of facts "shall contain the facts necessary to an understanding of the case, *stated accurately and fairly without argument or comment*, and with appropriate reference to the pages of the record on appeal." (Emphasis added.) Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). Hefter's statement of facts is argumentative and riddled with commentary. Briefs violating Rule 341(h) may be stricken in whole or in part. See *Ittersagen v. Advocate Health & Hospitals Corp.*, 2021 IL 126507, ¶ 37 ("Where a brief has failed to comply with the rules, we may strike portions of the brief or dismiss the appeal, should circumstances warrant."). However, we do not believe that the identified improprieties require us to strike

- 21 -

Hefter's statement of facts. See *Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 319 (2003) (declining to strike noncompliant factual summary, but admonishing counsel). Nevertheless, we will disregard the noncompliant portions of Hefter's statement of facts. See *P.J.'s Concrete Pumping Service, Inc. v. Nextel West Corp.*, 345 Ill. App. 3d 992, 997-98 (2004); see also *People v. Zarbock*, 2022 IL App (2d) 210238, ¶ 30.

¶ 50    Hefter's counsel has also violated the page limitations for briefs set forth in Illinois Supreme Court Rule 341(b)(1) (eff. Oct. 1, 2020). Hefter is the appellant and cross-appellee. Thus, pursuant to Rule 341(b)(1), he is allowed 50 pages (or 15,000 words) for his opening brief, 20 pages (or 6,000 words) for his reply brief, and 30 pages (or 9,000 words) for his cross-appellee brief which must be contained in his reply brief. Ill. S. Ct. R. 341(b)(1) (eff. Oct. 1, 2020); R. 343(b)(1) (eff. July 1, 2008). Hefter's combined reply/cross-appellee brief totals 43 pages. But 32 of those pages are devoted to the reply brief. Because Hefter's counsel did not request leave of court to submit a reply brief exceeding the page limitation (see Ill. S. Ct. R. 341(b)(2) (eff. Oct. 1, 2020)), on our own motion, we strike from Hefter's combined brief the 12 pages that exceed the page limitation for a reply brief. See *Kerger v. Board of Trustees of Community College District No. 502*, 295 Ill. App. 3d 272, 275 (1997) ("Parties ignore Rule 341 at their peril."). Further, we remind Hefter's counsel that the rules of procedure governing appellate briefs are mandatory and not mere suggestions (*Draves v. Thomas*, 2023 IL App (5th) 220653, ¶ 16), and we admonish counsel to comply with all supreme court rules in any future submissions. We now turn to the merits of the appeals.

¶ 51                                    A. Hefter's Appeal

¶ 52                                    1. Evidentiary Issues

¶ 53    Hefter first argues that a new trial is necessary to cure prejudicial errors. According to Hefter, the trial court improperly excluded a great deal of evidence relevant to his defenses in this matter. Hefter contends that the trial court's decisions on these matters were erroneous, affected the outcome of the proceeding, and thus warrant a new trial.

¶ 54    Evidentiary rulings are within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *People v. Avendano*, 2023 IL App (2d) 220176, ¶ 66; see *Burmac Metal Finishing Co. v. West Bend Mutual Insurance Co.*, 356 Ill. App. 3d 471, 481 (2005) (reviewing the trial court's denial of a motion for a new trial for an abuse of discretion). Under the abuse-of-discretion standard, a reviewing court owes deference to the trial court's ability to evaluate the impact of the evidence on the jury. *People v. Donoho*, 204 Ill. 2d 159, 186 (2003). The threshold for finding an abuse of discretion is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court. *Avendano*, 2023 IL App (2d) 220176, ¶ 66. Reasonable minds can disagree about whether certain evidence is admissible without requiring reversal of a trial court's evidentiary ruling under the abuse-of-discretion standard. *Donoho*, 204 Ill. 2d at 186. Moreover, an error in the exclusion or admission of evidence does not require reversal unless a party has been prejudiced or the result of the trial has been materially affected. *DiCosolo v. Janssen Pharmaceuticals, Inc.*, 2011 IL App (1st) 093562, ¶¶ 32, 40. The burden of establishing prejudice or showing that the trial court's error affected the outcome of the trial is on the party seeking reversal. *DiCosolo*, 2011 IL App (1st) 093562, ¶ 40.

¶ 55    We are also informed by the principle that evidence that is not relevant is not admissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011); *Vanoosting v. Sellars*, 2012 IL App (5th) 110365, ¶ 24. With these principles in mind, we turn to Hefter's contentions.

¶ 56                            a. Hefter's Full Scope of Knowledge

¶ 57    Hefter argues that several of the trial court's evidentiary rulings were erroneous and prejudicial because they excluded evidence of his "full scope of knowledge" at the time the allegedly defamatory statement was made. In this regard, Hefter identifies three categories of evidence that the trial court's rulings allegedly barred: (1) "admission of the facts and circumstances surrounding the voicemail"; (2) "information relevant to the defense of substantial truth"; and (3) "public information relevant to [Kalman's] reputation." We address each of these categories *seriatim*.

¶ 58                  i. The Facts and Circumstances Surrounding the Voicemail

¶ 59    Hefter asserts that the trial court's evidentiary rulings barred admission of the facts and circumstances surrounding the voicemail. Hefter contends that such evidence was relevant to the issue of punitive damages in that it addressed the "reprehensibility of the defendant's conduct." See *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456, 470 (2006) (listing the degree of reprehensibility of the defendant's misconduct as one of

- 24 -

three guideposts that should be considered in reviewing an award of punitive damages (citing *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 418 (2003), and *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996))). Hefter observes that the jury members were instructed that if they decided to award punitive damages, they were to consider three questions in settling on an amount, with the first question—how reprehensible was Hefter's conduct—being the most important. Further, in addressing reprehensibility, the jury was instructed to consider six factors, including "the fact and circumstances of the defendant's conduct."

¶ 60    According to Hefter, the trial court's evidentiary rulings precluded him from introducing evidence regarding information he was aware of at the time he left the voicemail. This, in turn, created a situation where the jury heard a limited presentation of the facts and circumstances that led to his decision to reach out to Zell. Hefter argues that this "artificially narrow version of reality" severely prejudiced him. Hefter contends there are three classes of information barred by the trial court that the jury should have heard to determine if his conduct was reprehensible: (1) the Braverman litigation; (2) Kalman's long-time association with Richard; and (3) firms associated with Kalman that had been delisted by FINRA. Hefter further asserts that the trial court's error was compounded based on comments by Kalman's attorney during his opening statement and closing argument: specifically, he told the jury that there was no evidence that Kalman defrauded anybody or had fraud on his record.

¶ 61    We begin our analysis with the Braverman litigation. In Braverman, the plaintiff alleged that under the supervision of KKC, a portfolio of inherited "[bank] stock that had once been valued at over $633,000 [was] sold for $3,812.42 net." The plaintiff sued for breach of contract. In the complaint, the plaintiff asserted that based on Richard's recommendation, he met with Kalman to discuss the management of his inherited account. The plaintiff alleged that "KKC engaged in

willful misfeasance, bad faith, and gross negligence in the performance of KKC's duties under the [parties'] Agreement." The trial court barred evidence regarding the Braverman lawsuit on the basis that it was not relevant. The court noted that Hefter's voicemail stated that Kalman defrauded investors, but there was nothing in the Braverman lawsuit about defrauding investors or Kalman having fraud on his record. Even so, the court stated that if Hefter could show that Kalman "profited" by any malfeasance, then Hefter would "have something to show" that Kalman defrauded an investor and it would reconsider its ruling.

¶ 62    Hefter notes that the plaintiff in Braverman alleged that he had suffered hundreds of thousands of dollars in losses as a result of "malfeasance." Hefter argues that evidence of the Braverman litigation was essential to an analysis of "the facts and circumstances" of his conduct, so the jury should have been permitted to hear and consider it in determining whether his conduct was "reprehensible."

¶ 63    However, we simply cannot conclude that the trial court's decision to exclude evidence of the Braverman lawsuit on the basis that it was not relevant constituted an abuse of discretion. As noted above, "relevant evidence" is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). In the present case, Hefter stated in the voicemail that Kalman had "defrauded *** investors in the past and ha[d] that on his record." In contrast, the plaintiff in Braverman sued for *breach of contract*. There were no allegations of fraud committed against any investor. And, as far as we are aware, Hefter never revisited the matter to present evidence that Kalman somehow profited by the malfeasance alleged by Braverman. Given this distinction, we simply cannot say that the trial court's determination that the Braverman litigation was not relevant constituted an abuse of discretion.

¶ 64　Hefter also contends that the trial court improperly excluded evidence of "an unbroken three-decade relationship between Kalman and [Richard] ***, as well as evidence of the publicly available records of litigation against [Richard] alleging fraud." During the offer of proof, Hefter testified that he reviewed Richard's BrokerCheck report prior to leaving the voicemail for Zell. Hefter testified that "it looked like [Richard] had been *** barred from FINRA, and he had numerous complaints, and that Mr. Kalman was continuing to work with him, which was the basis of my fear that [Zell] was putting herself in jeopardy." Hefter's attorney then stated that he would have offered the BrokerCheck "to show the overlap in [Richard's] firm or employment history and Mr. Kalman's employment history." In response, the trial court stood by its previous rulings and denied the offer of proof, stating, "I think that this was an attempt to make [Richard] an issue in this case. [Richard] certainly had his problems in life, but the broker reports concerning [Richard] is not—is not a report as to Kalman."

¶ 65　The trial court did not abuse its discretion in excluding the BrokerCheck report as to Richard because it was not relevant. As the trial court observed, Hefter accused *Kalman* of defrauding investors, not Richard. Regardless, Hefter was permitted to reference that Richard had been barred by FINRA, that Richard and Kalman had a long-time association, and that Kalman's association with Richard could jeopardize Zell. For instance, Hefter initially testified that "the guy" he was referring to in the voicemail was "Robert Kalman *and his association with Richard Kushnir*." (Emphasis added.) Hefter also testified that Richard had been "barred from FINRA" and "was associated with Mr. Kalman for the next 25 years and they remained partners." Hefter explained that his concern for Zell was that if Kalman "had any association with this guy [Richard] *who had been barred from FINRA* that she could be in trouble." (Emphasis added.) Hefter elaborated that "even if Robert Kalman wasn't the one who [committed fraud], *if his partner for*

*30 years did something wrong*, then [Zell] could be in trouble." (Emphasis added.) Hefter also explained, "when there is only two or three partners in a firm, if one of them makes a big mistake and loses a lot of money for a client, and that client tries to recover the money, I've seen situations where they are unable to recover because it's a small firm and regardless of which broker did the harm, [the investor] *** could lose money and that was my concern." Thus, contrary to Hefter's argument, he presented evidence that Richard had been barred by FINRA, that Richard and Kalman had a long-time association, and that he believed that Kalman's association with Richard could jeopardize Zell. Hence, Hefter's argument on this point lacks merit.

¶ 66    Hefter also contends that the trial court improperly excluded evidence of several firms Kalman had been associated with that had been "delisted" by FINRA. We disagree. During his opening statement, Hefter's attorney referenced that Kalman "worked for three expelled firms." Evidence of this statement was presented to the jury by way of the December 6, 2018, e-mail Hefter sent to Zell. In the e-mail, Hefter states that Zell may want to ask her broker "why 3 of his previous firms were expelled from the regulatory agency, FINRA." The e-mail was read to the jury and admitted into evidence. Hefter's January 1, 2019, e-mail to Murray also referenced the expelled firms. This argument therefore lacks merit.

¶ 67    Hefter protests, however, that the trial court deprived the jury of a full and accurate presentation of the contents of the e-mail exchange between him and Zell. Hefter points out that he attached to the December 6, 2018, e-mail a "Broker Registration History" screenshot showing the firms referenced in the e-mail. In her response, Zell stated that Hefter had accused her broker of being involved in fraud and forwarded her a "screenshot from FINRA." Zell further stated that when she went to the FINRA website to see how many disclosures Kalman had, it was "ZERO."

Hefter notes that the trial court redacted the screenshot before submitting the e-mail to the jury. Hefter argues that this was improper. We disagree.

¶ 68      The court explained that it was redacting the screenshot because "[t]here is nothing in the broker registration history that directly named Mr. Kalman." The trial court's statement is accurate. The screenshot merely lists the name of the firm followed by a statement that FINRA expelled the firms on a certain date. There is no implication that Kalman had anything to do with the expulsions. Moreover, nothing in Zell's response disputes that three of the firms associated with Kalman had been expelled by FINRA. She merely notes that her own research on the FINRA website does not show any disclosures against *Kalman* himself. This is undisputably true. Indeed, Hefter acknowledged at trial that he had no evidence that Kalman ever defrauded an investor. Thus, we find no abuse of discretion in the trial court's decision to redact the screenshot from Hefter's December 6, 2018, e-mail prior to sending it to the jury.

¶ 69      Hefter contends that the trial court's "decision to strike a portion of Hefter's e-mail while allowing Zell's [full] response, standing alone, is sufficient to warrant a new trial." In support of this proposition, Hefter cites *Schmidt v. Ameritech Illinois*, 329 Ill. App. 3d 1020 (2002). In *Schmidt*, the trial court allowed the plaintiff to introduce evidence, through testimony, as to the contents of an arbitration report, but refused to allow the defendant to use the report. *Schmidt*, 329 Ill. App. 3d at 1039-40. The reviewing court found the trial court's ruling to be an abuse of discretion, explaining that absent the other fatal problems with the plaintiff's case, it would have led to a remand for a new trial. *Schmidt*, 329 Ill. App. 3d at 1041. *Schmidt* is clearly distinguishable. In this case, unlike *Schmidt*, the entire text of both Hefter's and Zell's e-mails were admitted into evidence. While the trial court did redact the screenshot of the "Broker Registration History" that Hefter attached to his e-mail, the information contained in the screenshot—that three firms

associated with Kalman had been expelled by FINRA—was presented to the jury via Hefter's e-mails to Zell and Murray. Thus, there was no prejudice.

¶ 70            ii. Information Relevant to the Defense of Substantial Truth

¶ 71     Next, Hefter argues that the trial court's evidentiary rulings precluded him from presenting information relevant to the defense of substantial truth. As applied to the defense of substantial truth, Hefter claims that the trial court's evidentiary rulings constituted a misapplication of the law in three respects. First, the trial court precluded certain evidence based on its determination that there was no direct parity between Hefter's statement and the excluded evidence. Second, the trial court employed a standard that is entirely absent from any Illinois authority. Third, the trial court refused evidence that was probative to the question of the substantial truth of Hefter's statements based on whether it was persuasive to the court.

¶ 72     Truth is an absolute defense to a defamation action, and only the "substantial truth" is required for this defense. *Andrews v. At World Properties, LLC*, 2023 IL App (1st) 220950, ¶ 16. To be substantially true does not mean that every detail of the statement needs to be accurate. *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 42. A defendant establishes "substantial truth" when he or she shows that the "gist" or "sting" of the allegedly defamatory material is true. *Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 563 (2003). "The 'gist' or 'sting' of the alleged defamation means the heart of the matter in question—the hurtfulness of the utterance." *Andrews*, 2023 IL App (1st) 220950, ¶ 16 (citing *Vachet v. Central Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987)). The defendant bears the burden of establishing the "substantial truth" of an assertion. *Parker v. House O'Lite Corp.*, 324 Ill. App. 3d 1014, 1026 (2001).

¶ 73     Hefter first asserts that the trial court's rulings resulted in the exclusion of certain evidence based on the court's determination that there was no direct parity between Hefter's statement and

the excluded evidence. Hefter asserts that this is not the law and, therefore, the jury should have been permitted to determine whether Hefter's statements in the voicemail "would have an equivalent impact on the listener as the allegations in the *Braverman* lawsuit." We disagree. As noted earlier, Hefter stated in the voicemail that Kalman had "defrauded *** investors in the past and ha[d] that on his record." In contrast, the plaintiff in Braverman sued for *breach of contract*. There were no allegations of fraud in Braverman. While we agree that establishing substantial truth does not require the defendant to show precise linguistic overlap, Hefter makes no reasoned analysis in his brief illustrating how his statements that Kalman defrauded investors and had fraud on his record were sufficiently similar to the allegations made in Braverman. Indeed, the court stated that if Hefter could show that Kalman "profited" by any malfeasance, it would reconsider its ruling. Hefter never presented any such evidence. Accordingly, we reject this argument.

¶ 74   Hefter also claims that the "standard" employed by the trial court for excluding the Braverman litigation and another lawsuit against Kalman (DirecTV, Inc. v. Kalman, No. 03-CV-08610 (N.D. Ill.)) was that each of these matters ended in a settlement and neither involved a final judgment. We note that the portion of the record cited in Hefter's brief for this proposition does not support it. In addition, Hefter misrepresents the record. To the extent that the trial court mentioned that these matters ended in a settlement and neither involved a final judgment, this was not the reason the trial court excluded evidence of the lawsuits. Rather, the court excluded evidence of these lawsuits because they did not allege that Kalman defrauded an investor. As noted above, Braverman involved breach of contract action against KKC. In the DirecTV lawsuit, the plaintiff sued Kalman for allegedly intercepting and pirating channels. The plaintiff asserted causes of action for violations of federal law and civil conversion. We further observe that the allegations in

Braverman and DirecTV were just that—allegations. Hefter cites no authority that mere allegations are relevant in a defamation claim. We find no error.

¶ 75    Next, Hefter argues that as a result of its rulings, "the trial court refused evidence clearly probative of the substantial truth of Hefter's statements based on whether it was persuasive to the judge." According to Hefter, in so doing, the trial court improperly usurped the role of the jury as fact finder. As an example of this alleged error, Hefter cites the court's reasoning for disallowing evidence regarding Kalman's history of working for firms that were expelled by FINRA. Hefter asserts that the trial court ruled this evidence was irrelevant because Kalman was not employed by those firms at the time of the disciplinary action. Hefter claims, however, that the issue is whether Kalman's history of employment with so many firms that were expelled shortly after his departure would be a fact of concern to Hefter, such that the statement in his voicemail could be found to be substantially true. We reject this argument for two reasons. First, Hefter misrepresents the trial court's ruling. While the trial court did reference that Kalman left the firms prior to them being expelled by FINRA, it cited other reasons, too. For instance, the court noted that Kalman was not accused of any wrongdoing at any of those firms and there was no evidence that he was subject to any disciplinary actions at any of those firms. The court found that the probative value of such evidence was outweighed by its prejudicial effect because Hefter was trying to imply that because Kalman was with a firm that got disciplined, that means he is a "bad guy." Second, as we observed earlier, the trial court allowed Hefter's December 6, 2018, e-mail to Zell, in which he referenced that three of the firms associated with Kalman had been expelled by FINRA. Moreover, Hefter's attorney questioned Kalman about the various firms he worked for during his career. Thus, the jury had before it evidence from which it could decide if this constituted a "fact of concern" for Hefter such that the statement in the voicemail could be found to be substantially true. We find no error.

¶ 76                    iii. Public Information Relevant to Kalman's Reputation

¶ 77    Next, Hefter argues that the trial court erred by excluding public information relating to Kalman's reputation. Hefter states that by commencing a defamation action, Kalman "put his general reputation at issue" and "must be prepared to repel by evidence *any* attack on his character at large." (Emphasis added and internal quotation marks omitted.) *Corning v. Dollmeyer*, 123 Ill. App. 188, 191-92 (1905); see Ill. R. Evid. 405, Committee Comments (adopted Sept. 27, 2010) (noting that specific instances of a person's conduct are admissible under Rule 405(b)(1) as proof of a person's character or a trait of character only in those limited cases when a person's character or a trait of character is an essential element of a charge, claim, or defense, including "certain defamation actions"). According to Hefter, to properly analyze Kalman's claims of reputational injury and distress purportedly resulting from the voicemail, the jury should have been made aware that Kalman had (1) been identified in litigation as being involved with an investment account that lost almost all its value due to malfeasance (the Braverman litigation), (2) a long-time partnership with someone (Richard) expressly accused of fraud, (3) been employed by at least three firms that had been expelled by FINRA shortly after his departure, and (4) been accused of piracy and stealing cable television (the DirecTV litigation). Hefter asserts that that evidence, all of which is of public record, would suggest that Kalman's proclamation of reputational harm and distress from the voicemail were overstated. Hefter further asserts that he was prejudiced by the exclusion of this evidence.

¶ 78    In its posttrial ruling, the trial court addressed and rejected this precise issue. The trial court noted that Hefter's statement in the voicemail was "rather specific in that [Kalman] defrauded his investors and it is on his record." The court found that evidence of a general "bad reputation" was not relevant given Hefter's specific statement that Kalman defrauded investors and had that on his

record. Thus, not just "any misdeed or questionable association with bad characters" was pertinent. The court further determined that even if it erred by excluding such evidence, Hefter has not shown that he was prejudiced by the exclusion or that it affected the outcome of the trial. We agree with the trial court.

¶ 79    First, for defamation *per se*, a plaintiff "need not plead or prove actual damages to his reputation," as "statements that are defamatory *per se* 'are thought to be so obviously and materially harmful to the plaintiff that injury to [his] reputation may be presumed.' " *Seith v. Chicago Sun-Times, Inc.*, 371 Ill. App. 3d 124, 134 (2007) (quoting *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87 (1996)). Second, the trial court noted that Hefter stated that Kalman had defrauded investors and had fraud on his record. It specifically stated that if Hefter had any evidence that Kalman had defrauded investors in the past or that he had profited from any alleged malfeasance, it would allow the same to be admitted into evidence. Hefter admitted at trial that he had no evidence that Kalman defrauded investors.

¶ 80    Even if the trial court excluded some evidence of Kalman's reputation, considerable evidence on these points was admitted. For instance, Hefter presented evidence of Kalman's long-term relationship with Richard and Hefter's concerns about Richard. Hefter testified that "the guy" he was referring to in the voicemail was Kalman "and his association with Richard Kushnir." Hefter further testified that he was concerned for Zell because if Kalman "had association with this guy who had been barred from FINRA [Richard] *** she could indeed be in trouble." Hefter also testified that he "Googled" Richard

> "and realized that there were concerns that [he] had about [Kalman] aside from—take away
>
> the defrauding or anything like that—there were genuine concerns that [he] had that would

rule [him] not to recommend [Kalman] to my sister, my cousin, anyone that I knew because of the things that [he] had seen."

In addition, Hefter's December 6, 2018, e-mail to Zell and his January 1, 2019, e-mail to Murray, both of which were admitted into evidence, reference Hefter's concern that three firms associated with Kalman had been expelled by FINRA.

¶ 81    And while no evidence was admitted regarding the Braverman or DirecTV lawsuits, as the trial court noted, the plaintiffs in those cases did not lodge allegations that Kalman defrauded investors. In any event, Hefter voiced his concerns about Kalman's reputation. He testified that in the voicemail to Zell he "tried to encompass everything that [he] was reading" because "it was the worst thing that [he] had ever seen for a broker." Hefter further stated that he was "concerned with things beside fraud," including "a number of instruments" and "that's why [he] looked into everything." Hefter was asked what his concerns were regarding Kalman's record. He responded:

"[L]et's assume for a minute that he *** did not defraud anybody. *** I saw things outside of the fraud things that would worry me referring him to anybody to manage money for them. I don't know if I can list those things but I saw those things when I Googled him, when I looked him up and they were troublesome to me and they would be troublesome to anyone looking at them."

Because substantial evidence and testimony addressing most of these same points were admitted at trial, Hefter cannot demonstrate any prejudice from the trial court's evidentiary rulings. See *DiCosolo*, 2011 IL App (1st) 093562, ¶¶ 40-41. Thus, the trial court's evidentiary rulings did not constitute an abuse of discretion.

¶ 82                      b. Kalman's Reference to Attorney Fees at Trial

¶ 83    Hefter claims that it was error for the trial court to rule that, as a sanction for failing to disclose information regarding attorney fees, Kalman would be permitted to reference only that he had incurred attorney fees at trial and then to allow Kalman to testify regarding the number of hours his attorneys supposedly worked on his case "but not provide any detail regarding how much and without introducing the invoices as evidence." Hefter makes several sub-arguments in support of this claim. For instance, he asserts that Kalman's attorney fees were not relevant to the amount of punitive damages. He also contends (1) that the principle that the amount of fees expended may be taken into account when determining whether a punitive damages award comports with Illinois law is limited to reviewing courts and (2) that there is no Illinois authority standing for the proposition that a jury can and should consider attorney fees as part of their analysis in punitive damages. Hefter also claims that there was no foundation for Kalman's testimony regarding the number of hours his attorneys worked, therefore making his testimony inadmissible hearsay or speculation.

¶ 84    Even if improper, however, Hefter fails to establish how the reference to the number of hours Kalman's attorneys worked on the case prejudiced him. Rather than being included by the jury as a component of *punitive* damages, the jury sought to award *compensatory* damages against Hefter in the amount of 50% of Kalman's legal fees. However, following posttrial motions, the trial court struck the jury's award of attorney fees against Hefter. See *Morris B. Chapman & Associates, Ltd. v. Kitzman*, 193 Ill. 2d 560, 572 (2000) (noting that Illinois follows the "American rule" regarding the award of attorney fees, pursuant to which each party is responsible for its own litigation expenses absent statutory authority or a contractual agreement). We therefore find that

the reference to the number of hours Kalman's attorneys spent on the case does not warrant reversal.

¶ 85                                    c. Inconsistent Rulings

¶ 86     Hefter also contends that a new trial is warranted because the trial court inconsistently and arbitrarily applied its evidentiary rulings. According to Hefter, the "ever-changing ground rules about what could be said, and what could not" harmed his ability to present his defense and resulted in prejudice. As such, Hefter argues that he is entitled to a new trial.

¶ 87     Hefter first complains that during his opening statement, the trial court ordered counsel back to chambers after counsel mentioned that Kalman "had a three-decade relationship with a couple named Richard and Sarah [*sic*] Kushnir." Hefter asserts that this was "a topic of inquiry that was approved by the trial court at the pretrial hearing." Yet, following the discussion in chambers, the trial court "dictated that[ ] Hefter 'has to say' certain clarifications about Kalman any time the Kushnirs are mentioned." Hefter misrepresents the facts. The record shows that plaintiffs objected to defendants' opening statement. A conference was held outside the presence of the jury, during which defendants' attorney argued that the court's pretrial order "specifically said that [they] can mention regulatory issues, litigation, and disciplinary against [Richard]." The court responded "[r]ight," noted that "[n]one of it was against Kalman," and indicated that defendants would "have to say none of it was against Kalman when [counsel] says it." Defendants continued their opening statement, repeating that Kalman had a three-decade relationship with Richard and his wife and that Richard had an extensive history with "regulatory issues, litigation to the point where he was barred by their industry regulator." Thus, contrary to Hefter's argument, the trial court did not bar him from mentioning Kalman's relationship with Richard and his wife. We find no abuse of discretion in the trial court's ruling.

¶ 88    Hefter also complains that the trial court's unpredictability continued into his closing argument. Hefter notes that a pretrial order allowed him to offer testimony and present evidence regarding his "knowledge that Richard Kushinir had regulatory, litigation and disciplinary issues." Hefter asserts that despite the pretrial ruling that "evidence could be presented regarding [Richard's] 'regulatory, litigation and disciplinary issues,' *** [his] counsel was called to the bench and chastised when he made a statement [during closing argument] nearly verbatim to the judge's order." In ruling on defendants' posttrial motion, the trial court stated that defendants' interpretation of events was not accurate. The court explained:

> "The motion *in limine* ruling did not state that Defendants could present evidence of [Richard's] regulatory, litigation and disciplinary issues. It stated Defendants could present evidence of 'Steven Hefter's knowledge that Richard *** had regulatory, litigation and disciplinary issues.' This was in keeping with the court's effort to not make the trial about [Richard's] bad deeds, especially since he was a non-party to the litigation who was not able to respond or answer such allegations. In Defendants' closing, they indicated that evidence was presented as to [Richard's] regulatory, litigation and disciplinary issues, and this was simply not the case. At that time, the court chastised Defendants, not because they violated the motion *in limine* ruling, but because they attempted to state facts not in evidence. There was no contradiction in the court's ruling."

Hefter does not address the trial court's rationale. Given this lack of analysis, we cannot say that the trial court's evidentiary ruling on this point constituted an abuse of discretion.

¶ 89    Hefter continues that these inconsistencies "went on throughout the trial, including: the admission of testimony on attorney hours, the exclusion of testimony and documentary evidence of Kalman's employment history, and the *sua sponte* redaction of Hefter's e-mail to Zell."

However, Hefter does not develop these claims—he makes no effort to explain the nature of these alleged inconsistencies. We note further that the record in this case is substantial, consisting of 11 volumes and more than 6,900 pages; yet, Hefter does not cite the portions of the record where these alleged inconsistencies appear. A reviewing court " 'is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research.' " *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 69 (quoting *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010)). Failure to properly raise and develop an argument will result in forfeiture. *People v. Bishop*, 2024 IL App (2d) 230106, ¶ 64; see Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring the appellant's brief to include argument "which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" and further noting that points not argued are forfeited). We therefore consider these undeveloped claims forfeited and will not consider them further.

¶ 90                                          2. Damages

¶ 91                                    a. Hefter's Appeal

¶ 92     Alternatively, Hefter argues that further remittitur of the punitive damages award is required. Hefter makes two arguments in this regard. He claims that, even as remitted, the award of punitive damages (1) remains excessive under Illinois common law and (2) constitutes a violation of the due process afforded to him by the federal constitution.

¶ 93                                  i. Illinois Common Law

¶ 94     Punitive damages are not awarded as compensation, but serve to punish the wrongdoer and, in doing so, to deter that party and others from committing similar wrongful acts. *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 133 (2008).

"Punitive damages may be awarded when the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is 'committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate wanton disregard of the rights of others.' " *Slovinski v. Elliott*, 237 Ill. 2d 51, 58 (2010) (quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978)).

"To determine whether punitive damages are appropriate, 'the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.' " *Slovinski*, 237 Ill. 2d at 58 (quoting Restatement (Second) of Torts § 908(2) (1979)). Still, "[b]ecause punitive damages are penal in nature, they 'are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded.' " *Slovinski*, 237 Ill. 2d at 58 (quoting *Kelsay*, 74 Ill. 2d at 188). Where, as here, the trial court reduces a jury's punitive damages award by remittitur, we review the trial court's decision for an abuse of discretion. *Slovinski*, 237 Ill. 2d at 58; see 735 ILCS 5/2-1207 (West 2024) (providing that, pursuant to the Code of Civil Procedure, the "trial court may, in its discretion, with respect to punitive damages, determine whether a jury award for punitive damages is excessive, and if so, enter a remittitur and a conditional new trial"). An abuse of discretion will be found when there is no recognizable basis in the record to support the remittitur order entered by the trial court. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 59.

¶ 95    At the outset, Hefter argues that because punitive damages were assessed against both him and Wells Fargo in the amount of $1.1 million each, the award "actually amounted to 22 times presumed damages." According to Hefter, any liability alleged as to Wells Fargo "was derivative of Hefter's liability," so "Kalman would only be permitted a single recovery." Hefter cites no case

law for the proposition of aggregating, for an excessiveness determination, separate punitive damages awards against separate defendants. Thus, this argument has been forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (noting that an argument within an appellant's brief shall contain "citation of the authorities and the pages of the record relied on" and "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"); *Schaff v. Travelers Home & Marine Insurance Co.*, 2025 IL App (1st) 240276, ¶ 143. Indeed, multiple defendants' individual liability for punitive damages is assessed separately against each defendant; therefore, joint and several liability does not apply. See *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) ("Although the principle of joint and several liability prevents [the plaintiff] from recovering duplicative compensatory damages, it does not affect the defendants' individual liability for punitive damages, which are assessed separately against each defendant.").

¶ 96    Hefter next observes that the trial court began its remittitur ruling by referencing four "record setting verdics in defamation cases involving high net worth individuals," each of which involved "[an] award of punitive damages vastly exceed[ing] the claims for compensatory damages." Hefter argues that the trial court's reference to these cases was inappropriate and does not support the remittitur ordered because one of those cases involved a settlement rather than an "award," and the other three cases did not involve a ratio of punitive damages to compensatory damages approaching the ratio in this case. However, the trial court did not rely upon any of these cases in rendering its decision. In fact, the trial court expressly recognized that each of the referenced cases was "different" and that none of the cases were from Illinois. The trial court mentioned those cases to highlight that the defendants therein "did not care about the consequences of what they said to defame the plaintiffs," so the jury "concluded that the only way to halt outrageous conduct [was] to impose substantial financial consequences." After this passing

reference, the trial court discussed the jury's conduct and how the jury analyzed the facts before it in this case. At no point in the remainder of the ruling did the trial court reference these cases. Because the trial court did not rely upon any of these cases, Hefter's argument on this point does not warrant further remittitur of the award of punitive damages.

¶ 97   Next, Hefter directs us to two cases from the Illinois Supreme Court that, according to him, support a ratio of 1:1 punitive damages to presumed damages, based on conduct similar to that at issue in this matter. The two cases cited by Hefter are *Slovinski*, 237 Ill. 2d 51, and *Lawlor*, 2012 IL 112530.

¶ 98   Prior to discussing those cases, we observe that under an Illinois common law analysis, there is no requirement that the amount of punitive damages imposed on a defendant bear any particular proportion to the size of the plaintiff's compensatory recovery. *Deal v. Byford*, 127 Ill. 2d 192, 204 (1989); *Leyshon v. Diehl Controls North America, Inc.*, 407 Ill. App. 3d 1, 14 (2010); *Blount v. Stroud*, 395 Ill. App. 3d 8, 23 (2009). Indeed, ratios greater than the 11:1 ratio at issue here have been upheld on appeal by Illinois courts. See, *e.g.*, *Ford v. Herman*, 316 Ill. App. 3d 726, 733-35 (2000) (upholding award of punitive damages 75 times higher than compensatory damages, citing the outrageousness of the defendant's behavior (driving under the influence for the third time) and the need to punish and deter); *Ciampi v. Ogden Chrysler Plymouth, Inc.*, 262 Ill. App. 3d 94, 112-13 (1994) (upholding punitive damages award 20 times higher than compensatory damages, based on false statements made by car dealer).

¶ 99   In any event, Hefter's reliance on *Slovinski* and *Lawlor* does not convince us that the ratio imposed by the trial court on remittitur constituted an abuse of discretion under Illinois law. In *Slovinski*, the plaintiff worked as the chief financial officer of a communications company. Prior to the plaintiff's termination from the company, he had completed the company's 1995 annual

financial statement and the monthly financial statements for the first three months of 1996. *Slovinski*, 237 Ill. 2d at 54. After the plaintiff was terminated, the defendant, the company's chief executive officer, made disparaging comments about the plaintiff at a business meeting. Significantly, the defendant stated that the plaintiff had not completed the company's financial statements, the plaintiff " 'was not doing his job,' " the plaintiff " 'came in late and left early,' " the plaintiff was " 'sneaking off to do workouts,' " and the plaintiff " 'spent his time chasing p*** all day.' " *Slovinski*, 237 Ill. 2d at 54-55. The plaintiff filed a complaint against the defendant, alleging defamation *per se*. Following the entry of a default judgment in the plaintiff's favor, the matter proceeded to a jury trial on damages. The jury awarded the plaintiff $0 for lost wages, $0 for damage to reputation, $81,600 for emotional damages, and $2 million in punitive damages. The trial court remitted the punitive damages to $1 million. The appellate court further remitted the punitive damages to $81,600, an amount equal to the award of compensatory damages. *Slovinski*, 237 Ill. 2d at 57.

¶ 100 On appeal, the supreme court found that although the plaintiff argued there was a premeditated scheme to defame him, there was no material evidence to support such a claim. *Slovinski*, 237 Ill. 2d at 64. The supreme court further observed that the defendant made the defamatory statements only once, the scope of publication was limited to the individuals present at the business meeting, the jury found no damages for loss of reputation or lost wages, and there was no evidence of any physical harm to the plaintiff, such as visits to a doctor or therapist, missed work, or alteration in the plaintiff's normal daily activities. *Slovinski*, 237 Ill. 2d at 64. Given this record, the supreme court concluded that the defendant's conduct was "on the low end of the scale for punitive damages, far below those cases involving a defendant's deliberate attempt to harm

another person." *Slovinski*, 237 Ill. 2d at 64. As such, the supreme court affirmed the decision of the appellate court to remit the punitive damages to $81,600. *Slovinski*, 237 Ill. 2d at 64-65.

¶ 101   In *Lawlor*, the plaintiff left her employment with the defendant and began to work for a competitor. The defendant, concerned that the plaintiff had violated a noncompetition agreement, hired a private investigator. The private investigator, pretending to be the plaintiff, obtained the plaintiff's personal phone records by using personal information about the plaintiff obtained from the defendant. The investigator then provided those records to the defendant for the purported purpose of determining whether the plaintiff was contacting the defendant's customers. The plaintiff sued the defendant for intrusion on seclusion. See *Lawlor*, 2012 IL 112530, ¶ 33 (citing Restatement (Second) of Torts § 652B (1977)). The jury returned a verdict in the plaintiff's favor, awarding $65,000 in compensatory damages and $1.75 million in punitive damages. The trial court issued a remittitur, reducing the punitive damages to $65,000, but the appellate court reinstated the jury's original award of punitive damages.

¶ 102   On appeal, the supreme court found the case similar to *Slovinski* in that there was no evidence of an intentional, premeditated scheme. *Lawlor*, 2012 IL 112530, ¶ 62. Rather, the phone records were obtained as part of a "legitimate investigation" into a possible violation of a noncompetition agreement, not out of any animus toward the plaintiff by the investigator. *Lawlor*, 2012 IL 112530, ¶ 62. The supreme court also observed that the phone records were only viewed internally by a handful of the defendant's employees, there was no evidence that the phone records served any purpose other than to determine if the plaintiff had contact with one of the defendant's customers, the plaintiff never sought medical or psychological treatment for the emotional distress she claimed to have suffered, and the jury's verdict with respect to the award of compensatory damages ($65,000) showed limited harm to the plaintiff. *Lawlor*, 2012 IL 112530, ¶ 63.

Accordingly, the supreme court reduced the award of punitive damages to $65,000, an amount equal to the award of compensatory damages. *Lawlor*, 2012 IL 112530, ¶ 65.

¶ 103   Hefter argues that *Slovinski* "presents a close analogue to this matter." According to Hefter, similar to the statement in *Slovinski*, the statement at issue in this case was made a single time to a limited audience. Hefter further contends that, as in *Slovinski*, there was no evidence that he left the voicemail as part of any intentional, premeditated scheme to harm Kalman and there was no proof of physical or reputational harm. Hefter asserts that *Lawlor* establishes that under Illinois law, where the evidence establishes tortious conduct that is not part of a scheme to intentionally harm the plaintiff and results only in non-physical and non-economic harm, the highest available amount of punitive damages is a ratio of 1:1 to compensatory damages.

¶ 104   Contrary to Hefter's claim, his conduct in this case is not similar to the conduct at issue in either *Slovinski* or *Lawlor.* Unlike in *Slovinski*, and despite Hefter's assertion to the contrary, the jury in this case could reasonably conclude that Hefter left the voicemail as part of an intentional, premeditated scheme that constituted a deliberate attempt to harm Kalman.

¶ 105   Kalman alleged that Hefter made false statements that wrongly alleged past fraud by him in connection with Kalman's profession in an attempt to lure a significant client from him and Miramar. The jury heard ample evidence to support this theory. Critically, the jury was presented with evidence that on December 6, 2018, Hefter left a voicemail and an e-mail for Zell, a recently divorced, high-net-worth individual, who had hired Kalman as her financial advisor. Prior to leaving these communications, Zell had cancelled two meetings with Wells Fargo and declined to schedule a meeting with Hefter. Upon discovering that Zell had hired Kalman, Hefter researched him on BrokerCheck and Google. He also conducted a Google search of Kalman's former partner. Hefter then left Zell the voicemail, which accused Kalman of "having defrauded *** investors in

the past and having that on his record." Yet, Hefter admitted at trial that he had no evidence that Kalman had ever defrauded an investor. In addition, Hefter's e-mail suggested, without any supporting evidence, that Kalman was somehow connected to the expulsion by FINRA of three firms where Kalman had previously worked. Although Hefter reported the matter to Wells Fargo after Zell complained, he admitted at trial that he initially denied that he used the words "defrauded investors." Moreover, Hefter neither attempted to correct the untruths nor did he apologize to Kalman for his false remarks.

¶ 106   The jury was also presented with evidence that while Hefter and Kalman are direct competitors, Hefter and Wells Fargo (Hefter's employer at the time) were in a superior financial position than Kalman and Miramar (Kalman's advisory firm). Significantly, Hefter had a net worth of approximately $25 million and his personal income was roughly 10 times that of Kalman. Wells Fargo's multi-billion-dollar financial status dwarfed that of Miramar, which was a relatively new entity, having been formed in 2018. Moreover, the testimony at trial was replete with evidence regarding the importance of trust and reputation to maintain and attract customers. See *Lowe Excavating Co.*, 225 Ill. 2d at 472 (noting that small businesses often rely on reputation to maintain and attract customers). Indeed, Kalman testified that all of Miramar's business comes via referrals from existing clients. The jury could have reasonably determined that Hefter's remarks had the potential to seriously impact Kalman's business and Miramar's ability to continue as a going concern. See *O'Neill v. Gallant Insurance Co.*, 329 Ill. App. 3d 1166, 1185 (2002) (upholding award of punitive damages, noting that the defendant's conduct "had potentially grave consequences").

¶ 107   Based on this record, the jury could have reasonably concluded that Hefter—frustrated that Zell, who he had known socially, ignored his requests for a meeting and decided to give her

business to a smaller competitor—hatched a premeditated scheme to disparage Kalman in an attempt to steal away Zell's business. While Hefter repeatedly testified at trial that his motivation was "concern" for Zell and denied that Wells Fargo was "counting on bringing [Zell] in as a client" around the time he left the voicemail, the jury clearly rejected this stance. Indeed, in his January 1, 2019, e-mail to Murray, Hefter recounted attempts to schedule a meeting with Zell as recent as early December 2018. Had Hefter merely intended to voice his "concern" for Zell, he could have left her a voicemail simply asking her to return his call. However, given Zell's previous actions—cancelling two meetings with Wells Fargo and spurning Hefter's invitation to call him to schedule a meeting—the jury could have reasonably concluded that the defamatory message was intentionally delivered to Zell in the event that she elected not to return his call. By leaving a voicemail message, Hefter had time to consider his actions and clearly made a conscious decision to defame Kalman.

¶ 108    Likewise, we find Hefter's reliance on *Lawlor* misplaced. As noted above, in *Lawlor*, the supreme court found that the phone records were obtained as part of a "legitimate investigation" into the possible violation of a noncompetition agreement. *Lawlor*, 2012 IL 112530, ¶ 62. Moreover, the records were viewed only internally by a handful of the defendant's employees. *Lawlor*, 2012 IL 112530, ¶ 63. Unlike in *Lawlor*, there was no "legitimate investigation" that led Hefter to leave the voicemail and the accompanying e-mail. Further, rather than being published internally, the voicemail was circulated externally to Kalman's client, an individual outside of Wells Fargo's employees.

¶ 109    Hefter also insists that the words in *Slovinski* were "categorically worse" than those here because the statements in *Slovinski* were "unequivocal" and implicated more than one of the defamation *per se* categories recognized in Illinois. In particular, Hefter claims that the statements

in *Slovinski* "not only imputed a want of integrity in the plaintiff's discharge of his employment duties and a lack of ability in [the] plaintiff's profession but also imputed that [the] plaintiff had engaged in adultery or fornication." See *Tirio v. Dalton*, 2019 IL App (2d) 181019, ¶ 29 (listing the five categories of statements that Illinois recognizes as defamatory *per se*). In contrast, Hefter asserts that the statement he made was "qualified" and "nestled within a voicemail that is full of qualified language." Thus, he reasons, *Slovinski* presents "a similar, if not worse situation than what was presented to the jury here." So, he maintains, if the highest award the evidence of record supported in *Slovinski* was an amount equal to compensatory damages, the 11:1 award of punitive damages in this case is excessive.

¶ 110   We reject Hefter's position for three reasons. First, our supreme court has stated that "a false assertion of fact can be [defamatory] even though couched in terms of an opinion." *Bryson*, 174 Ill. 2d at 99-100; see *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990) (stating that simply couching the statement " 'Jones is a liar' " in terms of opinion—" 'In my opinion Jones is a liar' "—does not dispel the factual implications contained in the statement); *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 581 (2006) ("[T]here is no artificial distinction between opinion and fact: a false assertion of fact can be defamatory even when couched within apparent opinion or rhetorical hyperbole."). Second, Hefter's statement also implicated more than one defamation *per se* category. Hefter's words that Kalman had defrauded investors in the past and had that on his record can be interpreted as imputing (1) the commission of a criminal offense, (2) an individual's inability to perform his or her employment duties or a lack of integrity in performing those duties, and (3) a lack of ability in an individual's profession. See *Tirio*, 2019 IL App (2d) 181019, ¶ 29. Finally, and most important, as we set forth above, the record in this case

- 48 -

supports a finding that Hefter left the voicemail as part of an intentional, premeditated scheme that constituted a deliberate attempt to harm Kalman. We are therefore unpersuaded by this argument.

¶ 111 Hefter also argues that in fashioning the remittitur of punitive damages, the trial court impermissibly focused on his wealth because "[t]he trial court's order on the post-trial motions mentions [his] wealth at least five times." As noted earlier, however, in *Slovinski*, our supreme court stated that "[t]o determine whether punitive damages are appropriate, 'the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause *and the wealth of the defendant*.' " (Emphasis added.) *Slovinski*, 237 Ill. 2d at 58 (quoting Restatement (Second) of Torts § 908(2) (1979)). The financial status of the defendant is relevant because "an amount sufficient to punish or deter one individual may be trivial to another." *Ciampi*, 262 Ill. App. 3d at 113. Thus, to the extent the trial court relied on Hefter's wealth, it was proper. Indeed, the $1.1 million in punitive damages represents only 4% of Hefter's net worth of $25 million. See *Blount*, 395 Ill. App. 3d at 23 (upholding award of punitive damages that represented 3% of the defendant's net worth); *O'Neill*, 329 Ill. App. 3d at 1185 (upholding punitive damage award approaching 10% of the defendant's net worth); *Howard v. Zack Co.*, 264 Ill. App. 3d 1012, 1028 (1994) (upholding award of punitive damages of 5% of the defendant's net worth). In addition, Hefter's suggestion that, as remitted, the punitive damages award was based on wealth alone, is incorrect. As noted above, the malicious character of Hefter's act and the potential harm that could have arisen from Hefter's act supports the award of punitive damages in this case, as remitted. See *Slovinski*, 237 Ill. 2d at 58 (citing the considerations to determine whether punitive damages are appropriate).

¶ 112 Punitive damages serve to punish the wrongdoer and deter that party and others from committing similar wrongful acts. *Kirkpatrick*, 385 Ill. App. 3d at 133. In this case, the trial court

determined that the jury's award of $2.5 million punitive damages against Hefter was excessive and remitted the punitive damages award to $1.1 million. The trial court's decision did not constitute an abuse of discretion, as there is a recognizable basis in the record to support the remittitur order entered by the trial court; to wit, Hefter engaged in a calculated, premeditated strategy to harm a direct competitor in a weaker financial position through false accusations of fraud in an attempt to steal a competitor's customer. As such, we conclude that the remitted award of $1.1 million in punitive damages, assessed against Hefter by the trial court, was appropriate and did not constitute an abuse of discretion under an Illinois common law analysis as it served the purpose of punitive damages—punishment and deterrence.

¶ 113                              ii. Federal Constitutional Law

¶ 114   Hefter also argues that further remittitur of the punitive damages award is required because the as-remitted award in this case violates the due process clause of the federal constitution (U.S. Const., amend. XIV). Whether an award of punitive damages is unconstitutionally excessive is subject to *de novo* review. *Lowe Excavating Co.*, 225 Ill. 2d at 469.

¶ 115   The Supreme Court of the United States has stated that the due process clause of the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV) prohibits a state from imposing "grossly excessive" punishment on a tortfeasor. (Internal quotation marks omitted.) *Gore*, 517 U.S. at 562. For this reason, punitive damages must be reasonable or else they violate the due process clause. See *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 453-54 (1993) ("[T]he Due Process Clause of the Fourteenth Amendment imposes substantive limits 'beyond which penalties may not go.' " (quoting *Seaboard Air Line Ry. v. Seegers*, 207 U.S. 73, 78 (1907))). The Court has provided three "guideposts" to consider when the constitutionality of an award of punitive damages has been challenged: (1) the degree of

reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and civil penalties authorized or imposed in comparable cases. *Campbell*, 538 U.S. at 418; see also *Lowe Excavating Co.*, 225 Ill. 2d at 470 (applying the guideposts in an Illinois case).

¶ 116   The first guidepost, the reprehensibility of the defendant's misconduct, has been deemed " 'the most important indicium of the reasonableness of a punitive damages award.' " *Lowe Excavating Co.*, 225 Ill. 2d at 470 (quoting *Gore*, 517 U.S. at 575); see *Campbell*, 538 U.S. at 419 ("It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."). In assessing reprehensibility, a court considers the following factors: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard for the health and safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Lowe Excavating Co.*, 225 Ill. 2d at 470 (citing *Campbell*, 538 U.S. at 419). The Supreme Court of the United States has signaled that "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Campbell*, 538 U.S. at 419. Hefter contends that none of the reprehensibility factors are present here. We disagree.

¶ 117 Regarding the first reprehensibility factor, Kalman testified that he was depressed and distraught for a time, suffered from "personal angst," and had many sleepless nights. Notably, however, Kalman did not present any evidence of physical complications or manifestations resulting from his emotional suffering and sleepless nights. Thus, we find that the first factor does not weigh in favor of a finding of reprehensibility. See *Leyshon*, 407 Ill. App. 3d at 19 (finding that this factor did not strongly favor the plaintiff where he presented evidence of emotional distress and humiliation he suffered as a result of defamation, but no evidence of physical complications resulting from his emotional suffering). There is also no indication that the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of Kalman or anyone else. Thus, the second factor weighs against a finding of reprehensibility.

¶ 118 Likewise, we conclude that the third and fourth factors weigh against a finding of reprehensibility. Regarding the third factor, we observe that in *Lowe Excavating Co.*, the plaintiff temporarily lost one customer as a result of the defendant's conduct and the only financial loss proven was $4,680 in lost profits. *Lowe Excavating Co.*, 225 Ill. 2d at 472-73. Although our supreme court acknowledged that a small business such as the plaintiff often relies on reputation to maintain and attract customers, it held, on the record presented, that the plaintiff did not present sufficient evidence of financial vulnerability. *Lowe Excavating Co.*, 225 Ill. 2d at 472-73. Similarly, in this case, although Kalman's relationship with Zell was tenuous for a period after she received the voicemail, Kalman did not lose Zell as a client. Moreover, although Wells Fargo and Hefter are direct competitors of Miramar and Kalman and Wasserman believed that Miramar was "damaged" because of the voicemail, Wasserman could not say that Miramar lost business. To the contrary, both Kalman and Wasserman testified that Miramar has grown its business since Zell became a client. Accordingly, the third factor weighs against a finding of reprehensibility. As to

the fourth factor, the evidence suggests that Hefter left a single voicemail to a single individual. Moreover, Wasserman testified that he was unaware of any person other than Zell who heard Hefter's voicemail. At the same time, we note that Kalman was hesitant to investigate whether Hefter made the same statement to others in the community for fear of the false allegations spreading. As Kalman noted, "[I]t's the type of thing once you hear something like that, you can't unhear it." Nevertheless, we conclude that the fourth factor weighs against a finding of reprehensibility.

¶ 119  We now turn to the fifth and final reprehensibility factor, which addresses whether the harm was the result of intentional malice, trickery, deceit, or mere accident. *Lowe Excavating Co.*, 225 Ill. 2d at 470 (citing *Campbell*, 538 U.S. at 419). One acts with malice when a defamatory statement is published " 'with knowledge of [its] falsity or with reckless disregard of whether [it was] true or false.' " *Lowe Excavating Co. v. International Union of Operating Engineers Local No. 150*, 327 Ill. App. 3d 711, 722 (2002) (quoting *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 65 (1966)). Reckless disregard for the truth means that the defendant published the statements "while entertaining serious doubts as to the truth of the statements." (Emphasis omitted.) *Lowe Excavating Co.*, 327 Ill. App. 3d at 722-23. Here, Hefter insists that, at worst, his statement in the voicemail was "inartful" and that he did not act with intentional malice or deceit because he "did not know his statements were false or have a reason to seriously doubt their veracity." The record reveals otherwise.

¶ 120  As noted earlier, Hefter expressly testified at trial that he had no evidence that Kalman ever defrauded an investor. Nevertheless, he left a voicemail accusing Kalman, a direct competitor who relies on referrals from existing clients, of defrauding investors in an attempt to poach Zell, a high-net-worth client, to move her business. Hefter then denied making such allegations in an e-mail to

Wells Fargo. Moreover, although Hefter denied that Wells Fargo was "counting on bringing [Zell] in as a client" at the time he left the voicemail, it is undisputed that he was aware that, just weeks prior to the time Hefter left the voicemail for Zell, Wells Fargo had been trying to secure Zell as a client. Indeed, Hefter's January 1, 2019, e-mail to Murray strongly suggests that Hefter was clearly hoping to speak with Zell about landing her as a client just days prior to leaving the voicemail. Further, there was no evidence that Hefter attempted to correct the untruths in his voicemail, and Hefter acknowledged at trial that he made no attempt to apologize to Kalman for his false remarks. Compounding the malicious nature of Hefter's remark is the fact that Wells Fargo's financial status dwarfed that of Miramar, which was new to the industry; that Hefter's income was roughly 10 times that of Kalman's; and that the financial services industry typically relies on reputation and word of mouth to obtain clients. The foregoing facts demonstrate that Hefter either knew that the statements contained in his voicemail to Zell—that Kalman had defrauded investors in the past and had that on his record—were false or he had serious doubts as to their veracity. Nevertheless, he chose to leave the voicemail to Zell, accusing Kalman of defrauding investors and having fraud on his record. We thus find sufficient evidence to support the conclusion that Hefter acted with intentional malice and, therefore, his conduct can be characterized as reprehensible. We therefore find that the fifth factor supports a finding of reprehensibility.

¶ 121   Turning to the second guidepost, we must consider the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award. See *Campbell*, 538 U.S. at 418; see also *Gore*, 517 U.S. at 590 (Breyer, J., concurring, joined by O'Connor and Souter, JJ.); *Lowe Excavating Co.*, 225 Ill. 2d at 483-84. In this case, the jury awarded Kalman $100,000 in presumed damages and $2.5 million in punitive damages from Hefter. On remittitur, the trial court reduced the punitive damages award against Hefter to $1.1 million. Thus, the ratio between the

punitive damages and the compensatory damages is 11:1. Hefter argues that this ratio is excessive because Kalman did not suffer any actual harm, he offered no evidence of reputational damage, and Zell, the only person who heard the voicemail at issue, continued to socialize and do business with him.

¶ 122   "In considering whether a punitive damages award is constitutional, courts are instructed to consider whether there is a reasonable relationship between the punitive damages award and the potential and actual damages resulting from the defendant's conduct." *Lowe Excavating Co.*, 225 Ill. 2d at 484 (citing *Gore*, 517 U.S. at 581). "The Supreme Court has 'consistently rejected the notion that the constitutional line is marked by a simple mathematical formula' (*Gore*, 517 U.S. at 582 ***) and has declined 'to impose a bright-line ratio which a punitive damages award cannot exceed.' [*Campbell*, 538 U.S. at 425]." *Lowe Excavating Co.*, 225 Ill. 2d at 484. "Nevertheless, the Court has cautioned that 'in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.' " *Lowe Excavating Co.*, 225 Ill. 2d at 484 (quoting *Campbell*, 538 U.S. at 425). "The Court has also said that a punitive damages award of ' "more than 4 times the amount of compensatory damages" might be "close to the line." ' " *Lowe Excavating Co.*, 225 Ill. 2d at 484 (quoting *Gore*, 517 U.S. at 581, quoting *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 23 (1991)). "The Court has, however, recognized that 'because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages." ' " *Lowe Excavating Co.*, 225 Ill. 2d at 484-85 (quoting *Campbell*, 538 U.S. at 425, quoting *Gore*, 517 U.S. at 582). Thus, our supreme court has determined that the best method to

determine whether a given ratio is appropriate is to compare it to an award of punitive damages in similar cases. *Lowe Excavating Co.*, 225 Ill. 2d at 487.

¶ 123   The trial court did just that in this case in settling on a ratio of 11:1. The trial court relied principally on *Lowe Excavating Co.* In that case, the plaintiff, an excavation subcontractor, filed a multi-count complaint against the defendant, a union. The plaintiff alleged that the union picketed a federally funded project where the plaintiff's employees were working with placards containing false information that the plaintiff was not paying prevailing wages to its employees. The statements on the placards were found to constitute defamation *per quod*. The trial court ultimately awarded the subcontractor $4,680 in compensatory damages and $525,000 in punitive damages. The appellate court determined that the award of punitive damages was unconstitutionally excessive and reduced it to $325,000, a ratio of 75 to 1. Both parties appealed. The supreme court reversed and modified the punitive damages award to $50,000, "a double-digit ratio of approximately 11 to 1." *Lowe Excavating Co.*, 225 Ill. 2d at 490. The court explained that the union's conduct was "minimally reprehensible," the appellate court's award of punitive damages far exceeded awards given in other cases where the defendant's conduct was much more egregious, and the plaintiff did not present evidence that it sustained any injury to its reputation that extended beyond a strained and ultimately reconciled relationship with a general contractor. *Lowe Excavating Co.*, 225 Ill. 2d at 490-91.

¶ 124   Hefter again suggests that the closest comparable cases to this matter are *Slovinski*, 237 Ill. 2d 51, and *Lawlor*, 2012 IL 112530. But as noted above, both of those cases are easily distinguishable because, unlike this case, there was no evidence of an intentional, premeditated scheme. Hefter also directs us to other Illinois defamation cases imposing "a similar or lower than 1:1 multiplier." We will not consider two of those cases, as they are from the circuit court and lack

precedential value. *Delgado v. Board of Election Commissioners of Chicago*, 224 Ill. 2d 481, 488 (2007) ("Under Illinois law, the decisions of circuit courts have no precedential value \*\*\*."). The other Illinois case Hefter cites is distinguishable. In *Brown v. Farkas*, 158 Ill. App. 3d 772, 779-80 (1986), the reviewing court reduced an award of $1 million in punitive damages to $50,000, a 1:1 ratio to compensatory damages, in a case in which the plaintiff made false reports that the defendant had sexually abused his daughter. We find Hefter's reliance on *Brown* unpersuasive, as the rationale for the court's reduction was solely the fact that the amount of compensatory damages was $50,000, without any cogent analysis. *Brown*, 158 Ill. App. 3d at 780 ("We believe that in light of the fact that a $50,000 compensatory damage award against [the plaintiff] has been ordered, an award of punitive damages in the amount of $50,000 is sufficient to punish [the plaintiff] and deter others from committing a similar offense. Accordingly, the award of punitives must be reversed.").

¶ 125   Hefter further asserts that in situations such as *Lowe Excavating Co.*, where Illinois courts have awarded punitive damages yielding a ratio larger than 1:1 for defamation, the amount of punitive damages awarded is typically in the four to five figure range. In support of this proposition, Hefter cites *Lowe Excavating Co.*, 225 Ill. 2d at 490, and *Kainrath v. Grider*, 2021 IL App (1st) 200247-U, ¶¶ 19, 69. As noted above, however, in *Lowe Excavating Co.*, the supreme court found that a double-digit ratio of approximately 11 to 1 was "reasonable and constitutional." *Lowe Excavating Co.*, 225 Ill. 2d at 490. In *Kainrath*, the appellate court upheld jury awards of punitive damages against two defendants, one for $150,000 against $20,000 in compensatory damages (a 7.5:1 ratio) and the other for $20,000 against $7,000 in compensatory damages (a 2.85:1 ratio). *Kainrath*, 2021 IL App (1st) 200247-U, ¶¶ 19, 59-65. In other words, the reviewing court merely upheld a single-digit ratio awarded by the jury. There was no occasion to address the propriety of a double-digit ratio. And, notably, the court in *Kainrath* did not consider the

constitutionality of the awards of punitive damages under the three-guidepost analysis set forth in *Campbell*, 538 U.S. at 418, and employed by our supreme court in *Lowe Excavating Co.*, 225 Ill. 2d at 469-91. See *Kainrath*, 2021 IL App (1st) 200247-U, ¶¶ 59-65. Thus, we do not find that case relevant here.

¶ 126    Hefter further asserts that Illinois cases not involving defamation illustrate the excessive nature of the punitive damages as remitted in this case. In support, Hefter cites three cases: *Blount*, 395 Ill. App. 3d 8; *Kirkpatrick*, 385 Ill. App. 3d 119; and *Doe v. Parrillo*, 2021 IL 126577. We find *Blount* and *Kirkpatrick* easily distinguishable because, unlike this case, the ratios in those cases included attorney fees. See *Blount*, 395 Ill. App. 3d at 27-29 (noting that while the ratio of punitive damages to compensatory damages was "roughly 10 to 1," including the award of attorney fees resulted in a ratio of 1.8:1, "well within the permissible guideline"); *Kirkpatrick*, 385 Ill. App. 3d at 135-36 (holding that where the plaintiffs were awarded only nominal damages of $100 each against $300,000 in punitive damages, the ratio was not excessive because the plaintiffs were also awarded $83,000 in attorney fees, thereby "making the ratio of punitive damages just over 3½ times attorney fees, well within the range" permitted by *Lowe Excavating Co.*). These cases therefore do not support Hefter's claim that the ratio here violates due process.

¶ 127    In *Doe*, the defendant attacked and sexually assaulted the plaintiff on multiple occasions, resulting in physical injuries and hospitalizations. *Doe*, 2021 IL 126577, ¶ 4. The jury awarded the plaintiff $1 million in compensatory damages and $8 million in punitive damages. *Doe*, 2021 IL 126577, ¶ 13. The appellate court reduced the award of punitive damages to $1 million, but the supreme court reinstated the $8 million award, concluding that it was not "so unreasonable as to violate due process." *Doe*, 2021 IL 126577, ¶¶ 34, 58. We agree that the conduct in *Doe* was more egregious than Hefter's. Nonetheless, Hefter's conduct was reprehensible. Hefter's statements

imputed the commission of a criminal offense, implied that Kalman lacked integrity in performing his employment duties, and imputed a lack of ability in Kalman's profession. Moreover, although the ratio in *Doe* is slightly lower than the ratio here, the amounts at issue in *Doe* are much greater—$1 million in compensatory damages (versus $100,000 here) and $8 million in punitive damages (versus $1.1 million against Hefter here), thereby justifying the lower ratio.

¶ 128   The third guidepost involves consideration of the difference between punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Campbell*, 538 U.S. at 428; *Gore*, 517 U.S. at 583. As our supreme court has noted, however, no comparable Illinois law imposes a civil penalty, such as a fine, for defamation. See *Lowe Excavating Co.*, 225 Ill. 2d at 489. Thus, it is not necessary to further consider this guidepost. See *Lowe Excavating Co.*, 225 Ill. 2d at 489.

¶ 129   Because the two applicable *Gore* factors weigh in favor of the trial court's award of $1.1 million in punitive damages, we determine that the award is not grossly excessive and does not violate due process.

¶ 130                              B. Kalman's Cross-Appeal

¶ 131   In his cross-appeal, Kalman argues that the jury's full punitive damages award should be restored. We decline to address this claim in light of our decision herein. See *Lowe Excavating Co.*, 225 Ill. 2d at 492 (declining to address the appellee/cross-appellant's claim that punitive damages award should be increased where the court had previously rejected the appellant/cross-appellee's claim that punitive damages were excessive).

¶ 132                              III. CONCLUSION

¶ 133   In sum, we conclude that the trial court's evidentiary rulings did not constitute an abuse of discretion. Moreover, we find that the award of punitive damages, as remitted, was not excessive

under Illinois common law or the federal constitution. Finally, we reject Kalman's request to restore the jury's full punitive damages award. We therefore affirm the judgment of the circuit court of Lake County.

¶ 134   Affirmed.

*Miramar Capital LLC v. Wells Fargo Clearing Services LLC*, 2026 IL App (2d) 250055

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 2019-L-00801; the Hon. Charles William Smith, Judge, presiding. |
| **Attorneys for Appellant:** | Steven P. Gomberg and Amy J. Kanarowski, of Lynch Thompson LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Glenn L. Udell, Andrew A. Jacobson, and Glenn M. Kanter, of Brown, Udell, Pomerantz & Delrahim, Ltd., of Chicago, for appellees. |